UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SASHA WILFRED, Derivatively on Behalf of Nominal Defendant ITT EDUCATIONAL SERVICES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> KEVIN M. MODANY, JOHN F. COZZI, THOMAS I. MORGAN, JOHN E. DEAN, JAMES D. FOWLER, JR., JOANNA T. LAU, VIN WEBER, SAMUEL L. ODLE, JOHN A. YENA, DANIEL M. FITZPATRICK, <br><br> Defendants, <br><br> and <br><br> ITT EDUCATIONAL SERVICES, INC., <br><br> Nominal Defendant. | CIVIL ACTION NO. **13 CV 3110** <br><br> **JURY TRIAL DEMANDED** <br><br>  |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his undersigned attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant ITT Educational Services, Inc. ("ITT" or the "Company") against certain directors and officers of ITT named herein (the "Defendants"). Plaintiff bases his allegations on information uncovered from due investigation, including, without limitation: (a) review and analysis of public filings made by ITT and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on ITT's website concerning the Company's public statements; and (d) review of other publicly available information concerning ITT and other persons.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought by shareholders of ITT on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state law, including breaches of fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment, that occurred between April 24, 2008 and February 25, 2013 (the "Relevant Period") and that have caused substantial monetary losses to ITT and other damages, including irreparable damages to its reputation and goodwill.  On behalf of ITT, this action seeks damages, corporate governance reforms, an accounting, rescission, and the imposition of a constructive trust to remedy Defendants' violations of state law.

2.     According to the Company, ITT is a provider of postsecondary degree programs in the United States.  The Company offers master's, bachelor's, and associate's degree programs to approximately 61,000 students through 149 locations in 39 states.  While the majority of ITT student tuition is paid through financial aid provided by federal or state governments, such aid is often insufficient to cover tuition costs.  As a result, ITT's students frequently resort to private student loans to fill this funding gap.

3.     Prior to the start of the Relevant Period, funding sources for private student loans dwindled in connection with the widespread reduction in private lending that resulted from the financial crisis.  This reduction in private student lending posed a direct threat to one of ITT's key revenue streams.

4.     In order to maintain its strong earnings and profits in the face of the contracting market for private student loans, ITT entered into a series of risk-sharing agreements ("RSAs") with third-party lenders in 2007, 2009, and 2010.  The purpose of the RSAs was to incentivize those lenders to continue issuing loans to ITT students despite the deteriorating credit market. Pursuant to each RSA, the third-party lenders established and funded dedicated trusts that

provided the capital for loans to ITT students.  In exchange, ITT provided substantial repayment guarantees to those third-party lenders to ensure that they would be repaid in the event the students defaulted on their loans.  The combined amount of the loans covered by the RSAs that have been disclosed by the Company to date is in the hundreds of millions of dollars.

5.      Although ITT assumed the risk of guaranteeing the loans issued under each RSA, ITT did not properly account for those risks by establishing adequate reserves to cover expected losses.  Because such reserves diminish a company's reported earnings, as a result of ITT's failure to adequately reserve for its liability under the RSAs, ITT overstated its financial results and concealed the true extent of the risks that it faced under the RSAs.

6.      On July 26, 2012, the truth regarding ITT's significant liability under the RSAs began to be revealed.  Up to this point, all of ITT's exposure to losses arising from student loans issued under the RSAs had been kept off ITT's balance sheet through improper accounting practices.  However, when ITT was unable to secure lenders to fund a new RSA following the expiration of the 2010 RSA (the "PEAKS Program"), ITT began lending to students directly. The performance of these direct loans was so poor that the Company was forced to increase its allowance for doubtful accounts and its bad debt expense.  When the Company disclosed the poor performance of the loans it had initiated directly, the Company also implicitly revealed to investors for the first time that the loans previously issued through the RSAs had experienced similarly poor performance.  In reaction to these disclosures on July 26, 2012, ITT's stock price fell $7.65 per share, or 15.1 percent, to close at $42.78 per share.

7.      Several months later, on January 4, 2013, ITT announced that it had settled an action brought by Sallie Mae arising out of the Company's guarantee obligations under the 2007 RSA.  ITT settled this action for $46 million—nearly double the $26 million that Sallie Mae originally sought, and significantly more than shareholders were led to expect based on the

Company's prior statements.  In connection with this settlement, ITT took a $13.2 million charge for the 2007 RSA and an additional $70 million charge to establish a reserve related to the 2009 and 2010 RSAs.  These charges, and in particular the reserve for likely losses on the 2009 and 2010 RSAs, for the first time revealed the extent of the risk ITT faced from all three RSAs. Those reserves should have been established long before January 2013, and, by not setting aside such reserves, the Company significantly understated its liabilities and overstated its net income. Following the disclosure of the Sallie Mae settlement and the implications for the Company's liability under all the RSAs, the price of ITT stock dropped $3.72 per share, or 19.2 percent, to close at $15.57 per share on January 7, 2013.

8.      Then, on February 22, 2013, ITT revealed that it had received a subpoena from the SEC on February 8, 2013, which requested the production of documents relating to ITT's accounting for the 2009 and 2010 RSAs.  During the Relevant Period, ITT remained steadfast in its position that it was not required to include the liabilities from the RSAs on its balance sheet. By refusing to include liabilities from the RSAs on its financial statements, the Company improperly understated its liabilities and overstated its financial strength.  Following the announcement of the SEC subpoena, ITT's stock price declined $3.10 per share, or 16.6 percent, to close at $15.5 per share on February 25, 2013.

9.      The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)      the Company had tremendous liability under the RSAs;

(b)      the Company continually downplayed its risks associated with the RSAs and assured investors that it had properly set aside reserves to meet its liabilities;

(c)     the Company was improperly accounting for the RSAs, and its accounting practices were repeatedly questioned by the SEC and are now the subject of a formal SEC investigation; and

(d)     by failing to book adequate reserves for its liabilities under the RSAs, the Company misrepresented its earnings throughout the Relevant Period.

10.     As a result of Defendants' false statements, ITT common stock traded at artificially inflated levels during the Relevant Period.   However, as the truth about ITT's inadequate reserves and improper accounting practices and their effects on the Company's business was gradually revealed to investors, the Company's share price dramatically declined.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).  All Defendants are completely diverse from Plaintiff. The amount in controversy exceeds $75,000.00.  The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

13.     Plaintiff Sasha Wilfred is a resident of California and a shareholder of ITT and has been continuously throughout all relevant times.

14.     Nominal party ITT is a corporation organized under the laws of the state of Delaware, which maintains its principal place of business at 13000 North Meridian Street, Carmel, Indiana 46032.

15.     Defendant Kevin M. Modany ("Modany") is ITT's Chairman of the Board of Directors ("Board") and has been since 2008.  Modany is ITT's Chief Executive Officer and has been since 2007.  Modany is a citizen of Indiana.

16.     Defendant John F. Cozzi ("Cozzi") is an ITT director and has been since 2003. Cozzi serves on ITT's Audit Committee and Compensation Committee.  Cozzi chaired the Compensation Committee in 2012 until May 8, 2012.  Cozzi is a citizen of Illinois.

17.     Defendant Thomas I. Morgan ("Morgan") is an ITT director.  Morgan previously served as a Director of the Company from May 2006 to June 2008, and currently has served as a Director of the Company since January 2013.  Morgan serves on ITT's Audit Committee (since January 21, 2013).  Morgan is a citizen of Florida.

18.     Defendant John E. Dean ("Dean") is an ITT director and has been since 1994. Dean is a member of ITT's Audit Committee, for which he serves as the Chairman, and ITT's Nominating and Corporate Governance Committee.

19.     Defendant James D. Fowler, Jr. ("Fowler") is an ITT director and has been since 1994.  Fowler is a member of ITT's Compensation Committee.  Fowler served as senior vice president and director, human resources of ITT Industries, Inc., an industrial, commercial, machinery, and equipment Company now known as ITT Corporation, from November 2000 until his retirement in October 2002.  Fowler is a citizen of Virginia.

20.     Defendant Vin Weber ("Weber") is an ITT director and has been since 1994. Weber is also Chairperson on the Nominating and Corporate Governance Committee.  Weber is a citizen of Virginia.

21.     Defendant Joanna T. Lau ("Lau") is an ITT director and has been since 2003.  Lau is a member of ITT's Audit Committee.  Lau is a citizen of Massachusetts.

22.     Defendant Samuel L. Odle ("Odle") is an ITT director and has been since 2006. Odle is a member of ITT's Compensation Committee and the Nominating and Corporate Governance Committee.  Odle is a citizen of Florida.

23.     Defendant John A. Yena has been a director of ITT since May 2006.  Odle is a member of ITT's Compensation Committee and the Nominating and Corporate Governance Committee.  Yena is a citizen of Rhode Island.

24.     Defendant Daniel M. Fitzpatrick ("Fitzpatrick") is, and at relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of ITT.  Throughout the Relevant Period, Fitzpatrick spoke frequently to investors and signed and certified the accuracy of ITT's Forms 10-K for the fiscal years ended 2008, 2009, 2010, 2011, and 2012, and also signed and certified the accuracy of the Company's Forms 10-Q for the periods ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009, June 30, 2009, September 30, 2009, March 31, 2010, June 30, 2010, September 30, 2010, March 31, 2011, June 30, 2011, September 30, 2011, March 31, 2012, June 30, 2012, and September 30, 2012.

25.     Defendants Modany, Cozzi, Morgan, Dean, Fowler, Weber, Lau, Odle, Yena, and Fitzpatrick shall be collectively referred to herein as the "Defendants."

26.     Defendants Cozzi, Dean and Lau shall be collectively referred to herein as "Audit Committee Defendants."

## DEFENDANTS' DUTIES

27.     By reason of their positions as officers, directors, and/or fiduciaries of ITT and because of their ability to control the business and corporate affairs of ITT, Defendants owed ITT and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage ITT in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of ITT and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to ITT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     Defendants, because of their positions of control and authority as directors and/or officers of ITT, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with ITT, each of the Defendants had knowledge of material non-public information regarding the Company.

29.     To discharge their duties, the officers and directors of ITT were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of ITT were required to, among other things:

        (a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

        (b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

8

(c)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

30.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

(a)     Review and discuss with management the Company's annual and quarterly financial statements;

(b)     Review and discuss with management press releases regarding the Company's financial results and other information provided to securities analysts and rating agencies;

(c)     Review with management any deficiencies and material weaknesses in the design of operation of internal controls over financial reporting; and

(d)     Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to risk assessment and risk management.

## SUBSTANTIVE ALLEGATIONS

### A.     <u>Company Background</u>

31.     Founded in 1946, ITT provides post-secondary degree programs in the United States. It offers master's, bachelor's, and associate's degree programs, and career-oriented education programs in various fields, such as information technology, electronics technology, drafting and design, business, criminal justice, and nursing and health sciences.  The Company services approximately 61,000 students through 149 locations in 39 states, as well as online programs to students who are located in 48 states.

32.     While the majority of ITT student tuition is paid through financial aid provided by federal or state governments, such aid is often insufficient to cover tuition costs.  As a result, ITT's students frequently resort to private student loans to fill this funding gap.  Prior to the start of the Relevant Period, funding sources for private student loans dwindled as private lending diminished as a result of the financial crisis.  This reduction in private student lending posed a direct threat to one of ITT's key revenue streams.

33.     In order to maintain its strong earnings and profits in the face of the contracting market for private student loans, ITT strategically entered into a series of RSAs in order to encourage third-party lenders to continue issuing student loans despite deterioration in the credit market.

34.     First, in October 2007, ITT entered into a RSA (the "2007 RSA") with Sallie Mae, an unaffiliated lender, for private loans to be provided to its students by or through that lender to help pay the students' cost of education that student financial aid from federal, state, and other sources did not cover.  Under the 2007 RSA, the Company guaranteed the repayment of any private education loans that the lender charged off above a certain percentage.  The RSA was terminated effective February 22, 2008, such that no private education loans would be made under the RSA after that date, but loans made under the RSA prior to that date would still be covered by ITT's substantial guarantee obligations.

35.     Second, in February 2009, ITT entered into another RSA (the "2009 RSA") with an unaffiliated third party.  Like the 2007 RSA, under the 2009 RSA the Company guaranteed the repayment of any private education loans that were charged off above a certain percentage of the private education loans made under the 2009 RSA.

36.     Third, on January 20, 2010, ITT entered into a guarantee agreement and related documents in connection with a new private education loan program for its students, the PEAKS

program.  Under the PEAKS Program, an unaffiliated lender would make private education loans to eligible students and, subsequently, sell those loans to a trust.  The trust issued senior debt in the aggregate principal amount of $300 million ("Senior Debt") to investors.  The assets of the trust (which included, among other assets, the student loans held by the trust), served as collateral for, and were intended to be the principal source of, the repayment of the Senior Debt.  The Senior Debt bears interest at a variable rate based on the London Interbank Offered Rate plus a margin, and matures in January 2020.  In connection with the PEAKS Program, ITT transferred to the trust a portion of the amount of each private student loan disbursed to it, in exchange for a subordinated note issued by the trust to ITT.  Under the guarantee agreement, ITT guaranteed payment of principal, interest and certain call premiums on the Senior Debt, and administrative fees and expenses of the trust.  Due to the guarantee, ITT was required to consider whether a liability should be accrued on its balance sheet.  ITT determined not to record such liability.

37.   The combined amount of the loans covered by the 2007 RSA, 2009 RSA, and the PEAKS Program that have been disclosed by ITT to date is in the hundreds of millions of dollars.

38.   Using RSA-funded loans to boost its revenues and profits while concealing the massive risk facing the Company from its guarantees to the third-party lenders, ITT misstated its financial condition throughout the Relevant Period.  While the existence of the RSAs was disclosed to investors, the Company falsely assured investors that its exposure under the RSAs was limited and conservatively calculated.  For example, in its quarterly report on Form 10-Q filed with the SEC on April 24, 2008 - the first day of the Relevant Period - the Company stated that its "recorded liability related to the [2007] RSA as of March 31, 2008 was not material."  Similarly, on April 23, 2009, the Company stated that the "undiscounted maximum potential

future payments that we would be required to make under the 2009 RSA" was "not material." During a May 25, 2010 earnings call, CEO Kevin Modany stated that, with respect to its exposure under the 2009 RSA, ITT "tr[ies] to be ultraconservative relative to any down side associated with the performance of the portfolio, and [is] extremely conservative relative to that." ITT gave similar assurances with respect to its exposure under the 2007 RSA as well as the PEAKS Program.

39.     Accounting rules required ITT to hold certain funds in reserve in order to meet its obligations under the RSAs, and establishing such reserves would have offset income on a dollar-for-dollar basis.  Throughout the Relevant Period, ITT repeatedly assured investors that its reserves were sufficient to meet its RSA liabilities.  Specifically, during an October 20, 2011 earnings call, CEO Modany assured investors that "we're fully reserved for [the 2007 RSA] at this particular point." During that same call, CEO Modany also stated that ITT's reserve rate for its exposure under the PEAKS Program was more than adequate, telling investors that the program was "over-collateralized" and that "the performance on the loans has to be substantially worse than any historical experience we've seen, for us to have exposure here." At the same time, ITT announced earnings of $2.48 per share, exceeding analyst estimates for the third straight quarter that year.

**B.     Defendants' False and Misleading Statements During the Relevant Period**

40.     On April 24, 2008, the first day of the Relevant Period, ITT issued a press release with its results for the first quarter of 2008, ended March 31.  The Company announced that its diluted earnings per share ("EPS") increased 63.6 percent to $1.08 compared to $0.66 in the first quarter of 2007.

41.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2008 (the "1Q2008 10-Q"), which included the same results previously reported

in the Company's April 24, 2008 press release.  In the 1Q2008 10-Q, ITT assured investors that its "recorded liability related to the [2007] RSA as of March 31, 2008 was not material."  The 1Q2008 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2008 10-Q.

42.     On July 24, 2008, ITT issued a press release with its results for the second quarter of 2008, ended June 30.  The Company announced that its diluted EPS increased 37.9 percent to $1.20 compared to $0.87 in the second quarter of 2007.

43.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2008 (the "2Q2008 10-Q"), which included the same results previously reported in the Company's July 24, 2008 press release.  In the 2Q2008 10-Q, ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of June 30, 2008 was not material."  The 2Q2008 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2008 10-Q.

44.     On October 23, 2008, ITT issued a press release with its results for the third quarter of 2008, ended September 30.  The Company announced that its diluted EPS increased 30.6 percent to $1.28 compared to $0.98 in the third quarter of 2007.

45.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2008 (the "3Q2008 10-Q"), which included the same results previously reported in the Company's October 23, 2008 press release.  In the 3Q2008 10-Q, ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of September 30, 2008 was not material." The 3Q2008 10-Q was signed by CFO Fitzpatrick and contained certifications by

CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2008 10-Q.

46.    On January 22, 2009, ITT issued a press release announcing that its diluted EPS in the fourth quarter of 2008, ended December 31, increased 34.2 percent to $1.61 compared to $1.20 in the fourth quarter of 2007.

47.    On February 18, 2009, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2008 (the "2008 10-K"), which included the same results previously reported in the Company's January 22, 2009 press release.  In the 2008 10-K, ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of December 31, 2008 was not material." The 2008 10-K was signed by CEO Modany and CFO Fitzpatrick, along with members of ITT's board of directors, and contained certifications by Modany and Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2008 10-K.

48.    On February 23, 2009, ITT executives spoke with analysts, media representatives, and investors at the Credit Suisse Group Global Services Conference.  During the conference, CFO Fitzpatrick minimized the Company's exposure under the 2009 RSAs, entered into the previous week, by representing to investors that: "[I]n terms of the risk share, we would not expect that we would have any [profit and loss statement] implications relative to that risk share. We don't expect that we'll have to book a reserve."

49.    On April 23, 2009, ITT issued a press release with its results for the first quarter of 2009.  The Company announced that its diluted EPS increased 47.2 percent to $1.59 compared to $1.08 in the first quarter of 2008.

50.    After releasing its first quarter 2009 results on April 23, 2009, ITT hosted a conference call for analysts, media representatives, and investors during which CEO Modany represented to investors that, despite the poor condition of the economy, the Company's

guarantee obligations under the RSAs would not be triggered.  Specifically, Modany stated that under the RSAs: "[t]here's no reserve requirements on our part.  We have a risk share arrangement.  But the level is much, much higher than historical rates such that we certainly do not anticipate that ever being triggered, even with consideration for the current economic environment."

51.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2009 (the "1Q2009 10-Q"), which included the same results previously reported in the Company's April 23, 2009 press release.  In the 1Q2009 10-Q, the Company downplayed its exposure under the RSAs.  For example, according to 1Q2009 Form 10-Q, "the undiscounted maximum potential future payments that [ITT] would be required to make under the 2009 RSA and the amount of the liability as of March 31, 2009 were not material." The 1Q2009 10-Q similarly assured investors that ITT's "recorded liability related to the 2007 RSA as of March 31, 2009 was not material."

52.     The 1Q2009 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2009 10-Q.

53.     On July 23, 2009, ITT issued a press release with its results for the second quarter of 2009.  The Company announced that its diluted EPS increased 55.8 percent to $1.87 compared to $1.20 in the second quarter of 2008.

54.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2009 (the "2Q2009 10-Q"), which included the same results previously reported in the Company's July 23, 2009 press release.  In the 2Q2009 10-Q, the Company continued to assure investors that it "did not record a liability for our guarantee obligations under the 2009 RSA as of June 30, 2009, because we do not anticipate that the private education loans

charged off will exceed the percentage that would require us to make a payment under our guarantee." The 2Q2009 10-Q also assured investors that ITT's "recorded liability related to the 2007 RSA as of June 30, 2009 was not material." The 2Q2009 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2009 10-Q.

55.    On October 22, 2009, ITT issued a press release with its results for the third quarter of 2009.  The Company announced that its diluted EPS increased 56.3 percent to $2.00 compared to $1.28 in the third quarter of 2008.

56.    After releasing its third quarter 2009 results on October 22, 2009, ITT hosted a conference call for analysts, media representatives, and investors during which CEO Modany again assured investors that the Company could not envision any scenario under which ITT would have to incur a charge pursuant to its obligations under the RSAs.  Specifically, Modany stated that: "We don't see any kind of scenario; and of course, we're stressing these things as you would expect given the current environment.  We don't see any scenario where we've got any kind of charge that we'd record as a result of that guarantee that we provide."

57.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2009 (the "3Q2009 10-Q"), which included the same results previously reported in the Company's October 22, 2009 press release.  In the 3Q2009 10-Q, ITT continued to minimize its liability under the RSAs, once against representing that it "did not record a liability for our guarantee obligations under the 2009 RSA as of September 30, 2009, because we do not anticipate that the private education loans charged off will exceed the percentage that would require us to make a payment under our guarantee." The Company also continued to assure investors that its "recorded liability related to the 2007 RSA as of September 30, 2009 was not material."

58.     The 3Q2009 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2009 10-Q.

59.     On January 21, 2010, ITT issued a press release announcing that its diluted EPS for the fourth quarter of 2009 increased 59.0 percent to $2.56 compared to $1.61 in the fourth quarter of 2008.

60.     After releasing its fourth quarter 2009 results on January 21, 2010, ITT hosted a conference call for analysts, media representatives, and investors during which CFO Fitzpatrick described the 2010 RSA, known as the PEAKS Program.  Fitzpatrick assured investors that "we do not believe that we will be required to make any material payments under our guarantee." Fitzpatrick also stated that the Company would maintain an adequate reserve to meet any potential obligations under the PEAKS Program, telling investors that:

> [W]e've stressed this structure well beyond, and I mean well beyond historical performance that should provide for a very good result for us. And all of that in terms of that reserving, that extra cushioning that we're talking about, it is reflected in those 2010 goals that we put out today.

61.     On February 19, 2010, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2009 (the "2009 10-K"), which included the same results previously reported in the Company's January 21, 2010 press release.  With respect to the 2009 RSA, the Company continued to assure investors that it "did not record a liability for our guarantee obligations under the 2009 RSA as of December 31, 2009, because we do not anticipate that the amount of private education loans charged off will exceed the percentage that would require us to make a payment under our guarantee."

62.     In the 2009 10-K, the Company also continued to assure investors that its "recorded liability related to the 2007 RSA as of December 31, 2009 was not material."

63.    The 2009 10-K was signed by CEO Modany and CFO Fitzpatrick, along with other ITT executives and contained certifications by Modany and Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2009 10-K.

64.    On April 22, 2010, ITT issued a press release announcing its first quarter 2010 financial results.  The Company reported net income of $87.5 million, or $2.46 diluted EPS, and revenue of $384.0 million for the first quarter of 2010.

65.    Later that day, ITT filed with the SEC its quarterly report Form 10-Q for the first quarter of 2010 (the "1Q2010 10-Q"), which included the same results previously reported in the Company's April 22, 2010 press release.  In the 1Q2010 10-Q, the Company explained that, based on its interpretation of accounting guidelines, it was not required to include the results related to the PEAKS Program in its financial statements.  Specifically, the 1Q2010 10-Q stated that ITT "held a variable interest in the trust, but we are not considered the primary beneficiary for purposes of including the financial results of the trust in our consolidated financial statements."

66.    The Company also continued to downplay its liability under the RSAs by conveying to investors that "[a]s of March 31, 2010, we had not made any guarantee payments under the PEAKS Program, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."

67.    The 1Q2010 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2010 10-Q.

68.    On May 25, 2010, ITT executives spoke with analysts, media representatives, and investors at the Bank of America Merrill Lynch Services Conference.  During the conference, CEO Modany continued to assure investors of the Company's conservative approach toward

calculating its exposure under the RSAs.  Specifically, Modany explained that the Company was "comfortable" with the PEAKS Program because:

> [W]e look at the data that we have collected historically and we try to be ultraconservative relative to any down side associated with the performance of the portfolio, and be extremely conservative relative to that . . . . And we can't give you the numbers, but it is multiples of what we have experienced in terms of what this thing can handle before we would see any kind of modification to our financial results.

69.     On July 22, 2010, ITT issued a press release announcing its second quarter 2010 financial results.  The Company reported net income of $96.0 million, or $2.78 in diluted EPS, and revenue of $401.8 million for the second quarter of 2010.

70.     On July 23, 2010, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2010 (the "2Q2010 10-Q"), which included the same results previously reported in the Company's July 22, 2010 press release.  In the 2Q2010 10-Q, the Company once again assured investors that it properly omitted its obligations under the RSAs from its financial statements.  Specifically, ITT stated that it is "not the primary beneficiary of the PEAKS Trust" and is, therefore, "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

71.     In the 2Q2010 10-Q, ITT made similar representations regarding the 2009 RSA, informing investors that the Company is "not the primary beneficiary of the 2009 Entity" and is "not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

72.     The 2Q2010 10-Q also continued downplay the Company's liability under the RSAs, stating that "[a]s of June 30, 2010, we had not made any guarantee payments under the PEAKS Guarantee, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."

73.    The 2Q2010 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2010 10-Q.

74.    On October 21, 2010, ITT issued a press release announcing its third quarter 2010 financial results.  The Company reported net income of $93.2 million, or $2.82 in diluted EPS, and revenue of $400.6 million for the third quarter of 2010.

75.    On October 22, 2010, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2010 (the "3Q2010 10-Q"), which included the same results previously reported in the Company's October 21, 2010 press release.  In the 3Q2010 10-Q, ITT assured investors that it properly omitted its obligations under the RSAs from its financial statements. Once again, the Company represented that it was "not the primary beneficiary of the PEAKS Trust" and was, therefore, "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

76.    In the 3Q2010 10-Q, ITT made similar representations with respect to the 2009 RSA, telling investors that the Company is "not the primary beneficiary of the 2009 Entity" and, as a result, is "not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

77.    The Company also continued to assure investors in its 3Q2010 10-Q that "[a]s of September 30, 2010, we had not made any guarantee payments under the PEAKS Guarantee, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."

78.    The 3Q2010 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2010 10-Q.

79.     On January 20, 2011, ITT issued a press release announcing its fourth quarter and full-year 2010 financial results.  The Company reported net income of $97.5 million, or $3.14 in diluted EPS, and revenue of $410.1 million for the fourth quarter of 2010.  The Company further reported net income of $374.2 million, or $11.17 in diluted EPS, and revenue of $1.6 billion for the full year of 2010.

80.     On February 18, 2011, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2010 (the "2010 10-K"), which included the same results previously reported in the Company's January 20, 2011 press release.  Assuring investors that it properly accounted for its obligations under the RSAs, the Company continued to represent that it was "not the primary beneficiary of the PEAKS Trust" and was "not required under ASC 810 to include the financial results of the PEAKS Trust in our consolidated financial statements."

81.     In the 2010 10-K, the Company also assured investors that it was "not the primary beneficiary of the 2009 Entity" and, "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our consolidated financial statements for the fiscal year ended December 31, 2010."

82.     The 2010 10-K also continued to downplay the Company's exposure under the RSAs by stating that "[a]s of December 31, 2010, we had not made any guarantee payments under the PEAKS Guarantee, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."

83.     The 2010 10-K was signed by CEO Modany and CFO Fitzpatrick, along with other ITT executives.  The 2010 10-K also contained certifications by Modany and Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2010 10-K.

84.     On April 21, 2011, ITT issued a press release announcing its first quarter 2011 financial results.  The Company reported net income of $85.4 million, or $2.91 in diluted EPS, and revenue of $383.2 million for the first quarter of 2011.

85.     On April 22, 2011, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2011 (the "1Q2011 10-Q"), which included the same results previously reported in the Company's April 21, 2011 press release.  Once again, the 1Q2011 10-Q stated that ITT properly omitted its obligations under the RSAs from its financial statements.  Specifically, the 1Q2011 10-Q stated that ITT was "not the primary beneficiary of the PEAKS Trust" and, therefore, was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

86.     The 1Q2011 10-Q made similar representations with respect to the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

87.     In the 1Q2011 10-Q, the Company also continued to downplay its exposure under the RSAs by stating that "[a]s of March 31, 2011, our recorded liability for the guarantee obligations related to those arrangements was not material."

88.     The 1Q2011 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2011 10-Q.

89.     On July 21, 2011, ITT issued a press release announcing its second quarter 2011 financial results.  The Company reported net income of $79.0 million, or $2.85 in diluted EPS, and revenue of $387.9 million for the second quarter of 2011.

90.    On July 25, 2011, ITT filed with the SEC its quarterly report Form 10-Q for the second quarter of 2011 (the "2Q2011 10-Q"), which included the same results previously reported in the Company's July 21, 2011 press release.  In the 2Q2011 10-Q, the Company assured investors that it properly accounted for its obligations under the RSAs in its financial statements.  In particular, the 2Q2011 10-Q stated that ITT was "not the primary beneficiary of the PEAKS Trust" and was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

91.    The 2Q2011 10-Q made similar representations with respect to the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

92.    In the 2Q2011 10-Q, the Company also continued to downplay its exposure under the RSAs by stating that "[a]s of June 30, 2011, our recorded liability for the guarantee obligations related to these arrangements was not material."

93.    The 2Q2011 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2011 10-Q.

94.    On October 20, 2011, ITT issued a press release announcing its third quarter 2011 financial results.  The Company reported net income of $67.3 million, or $2.48 in diluted EPS, and revenue of $360.6 million for the third quarter of 2011.

95.    During its third quarter 2011 earnings conference call, CEO Modany continued to assure investors that the Company was fully reserved against any liabilities it faced under the 2007 RSA, by explaining that "we feel like we're fully reserved for that at this particular point."

96.     Also during the October 20 earnings call, in response to a question regarding reserve rates used for loans issued pursuant to the PEAKS program, CEO Modany explained that the PEAKS Program was over-collateralized with respect to its potential obligations under the RSAs.  In particular, Modany told investors that PEAKS "is a program that's over-collateralized in terms of the assets that are backing the notes associated with this program, and the performance on the loans has to be substantially worse than any historical experience we've seen, for us to have exposure here."

97.     On October 21, 2011, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2011 (the "3Q2011 10-Q"), which included the same results previously reported in the Company's October 20, 2011 press release.  In the 3Q2011 10-Q, the Company again assured investors that it properly omitted its liabilities under the RSAs from its financial statements. Specifically, ITT stated that it was "not the primary beneficiary of the PEAKS Trust" and, therefore, was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

98.     Similarly, the 3Q2011 10-Q stated that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

99.     The 3Q2011 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2011 10-Q.

100.    On January 26, 2012, ITT issued a press release reporting its fourth quarter and full year 2011 financial results.  The Company reported net income of $76.0 million, or $2.87 in diluted EPS, and revenue of $368.3 million for the fourth quarter of 2011.  The Company further

reported net income of $307.8 million, or $11.13 in diluted EPS, and revenue of $1.5 billion for the full-year 2011.

101.   On February 24, 2012, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2011 (the "2011 10-K"), which included the same results previously reported in the Company's January 26, 2012 press release.   In the 2011 10-K, ITT continued to assure investors that its accounting treatment of the RSAs was proper because the Company was "not the primary beneficiary of the PEAKS Trust."

102.   The 2011 10-K also stated that the Company was "not the primary beneficiary of the 2009 Entity" and "[a] s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our consolidated financial statements."

103.   The 2011 10-K was signed by CEO Modany and CFO Fitzpatrick, along with other ITT executives.   The 2011 10-K also contained certifications by Modany and Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2011 10-K.

104.   On March 13, 2012, ITT executives spoke with analysts, media representatives, and investors at the Credit Suisse Global Services Conference, during which CEO Modany continued to downplay ITT's exposure under the RSAs.   Specifically, Modany told investors that there is a "lack of understanding" among investors as to the Company's risk under the PEAKS Program and assured investors that "we have excessive collateralization in that portfolio such that there really isn't any expectation from our perspective that we would ever have to provide any additional funding to support that program."

105.   CEO Modany also explained that the PEAKS Program was over-collateralized.   In particular, Modany stated that:

> [T]here's a level of conservatism there that there is some expectation that there will be funds that come back to the Company, i.e., we have more than enough excessive collateralization in there, but we've not recorded that amount as an asset on our books. So we have this sort of contingent

asset, which goes above and beyond exposure that might be there again, a conservative way to report this and account for it.

106.   On April 26, 2012, ITT issued a press release reporting its first quarter 2012 financial results.  The Company reported net income of $61.1 million, or $2.38 in diluted EPS, and revenue of $341.8 million for the first quarter of 2012.

107.   Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2012 (the "1Q2012 10-Q"), which included the same results previously reported in the Company's April 26, 2012 press release.  In the 1Q2012 10-Q, the Company again assured investors that it properly omitted its RSA exposure from its financial statements, telling investors that ITT was "not the primary beneficiary of the PEAKS Trust" and, therefore, was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

108.   The 1Q2012 10-Q included similar representations with respect to the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

109.   The Company also continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $37.5 million" and "the substantial majority of this amount pertains to our guarantee arrangements under the RSAs."

110.   The 1Q2012 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2012 10-Q.

C.      **The Truth Begins to Emerge**

111.   On July 26, 2012, the truth regarding ITT's significant liability under the RSAs began to be revealed.  That day, the Company issued a press release with its results for the second quarter of 2012.  Up to this point, all of ITT's exposure to the losses arising from student loans issued under the RSAs had been kept off ITT's balance sheet through improper accounting practices.  However, as a result of the expiration of the 2010 RSA, and ITT's apparent inability to secure lenders to fund a new RSA, ITT began lending to students directly.  The performance of these direct loans was so poor that the Company was forced to increase its allowance for doubtful accounts and its bad debt expense.  In connection with the disclosure of the poor performance of the loans ITT initiated directly, the Company also implicitly revealed to investors that the loans previously issued through the RSAs had experienced similarly poor performance.

112.   These disclosures were the first time the Company revealed that its liability under the RSAs was more significant than ITT had previously represented.  Indeed, in response to these disclosures, at least one analyst at PAA Research LLC ("PAA") wrote that ITT faced significant risks from its contingent liabilities under the RSAs—far greater exposure than the negligible risks the Company had described to investors.  See Bradley Safalow, *ESI: Where Did the Cash Go? ESI's Leverage Looms Large as Prospective FCF Generation Dwindles, Reducing Target to $30,* PAA Research LLC, July 26, 2012.  According to PAA, these risks were so serious that it urged management to act immediately in order to solidify the Company's capital position.

113.   Following these disclosures, ITT's stock price dropped $7.65 per share, or 15.1 percent, to close at $42.78 per share on July 26, 2012, representing a market capitalization loss of approximately $180 million.

114.   Although the truth regarding the Company's exposure under the RSAs began seeping into the marketplace, ITT continued to conceal the true extent of its RSA liabilities by omitting these liabilities from its financial statements.  Indeed, on July 27, 2012, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2012 (the "2Q2012 10-Q"), which included the same results previously reported in the Company's July 26, 2012 press release and assurances that ITT had properly omitted its obligations under the RSAs from its financial statements. Specifically, the Company stated that it was "not the primary beneficiary of the PEAKS Trust" and therefore was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

115.   The 2Q2012 10-Q made similar representations regarding the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a] s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

116.   The Company also continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $41.6 million, the substantial majority of which pertained to our guarantee arrangements under the RSAs."

117.   The 2Q2012 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2012 10-Q.

118.   On October 25, 2012, ITT issued a press release reporting its third quarter 2012 financial results.  The Company reported net income of $42.9 million, or $1.83 in diluted EPS, and revenue of $314.7 million for the third quarter of 2012.

119.    After releasing its third quarter 2012 results on October 25, 2012, ITT hosted a conference call for analysts, media representatives, and investors during which CEO Modany continued to reassure investors that the Company's liabilities under the RSAs was limited. Specifically, Modany assured investors that with respect to the Company's private lending, he: "wouldn't say that we've seen any material degradation in that.  It hasn't really changed materially."

120.    On October 29, 2012, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2012 (the "3Q2012 10-Q"), which included the same results previously reported in the Company's October 25, 2012 press release.  In the 3Q2012 10-Q, the Company continued to assure investors that it properly omitted its obligations under the RSAs from its financial statements.  Specifically, the 3Q2012 10-Q stated that ITT was "not the primary beneficiary of the PEAKS Trust" and, therefore, was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

121.    The 3Q2012 10-Q made similar representations regarding the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

122.    The Company also continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $44.3 million, the substantial majority of which pertained to our guarantee arrangements under the RSAs."

123.    The 3Q2012 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2012 10-Q.

124.   Then, on January 4, 2013, ITT filed a current report on Form 8-K disclosing that it had settled an action brought by Sallie Mae arising out of the Company's guarantee obligations under the 2007 RSA.  ITT revealed that it settled this action for $46 million—nearly double the $26 million that Sallie Mae had originally sought, and well more than shareholders were expecting, especially considering the Company had estimated its liabilities at $44.3 million for all of the RSAs as of September 30, 2012.  In connection with this settlement, ITT took a $13.2 million charge for the 2007 RSA and an additional $70 million charge to establish a reserve related to the 2009 and 2010 RSAs.  As noted above, these charges, and in particular the reserve for likely losses on the 2009 and 2010 RSAs, should have been booked into the Company's financial statements long before January 2013, and by not establishing that reserve, the Company significantly understated its liabilities and overstated its net income.

125.   According to PAA, the Company's failure to account for its actual liability under the 2007 RSA caused ITT to effectively overstate its earnings by $0.06-$0.08 per share for the previous two years.  Bradley Safalow, *ESI: 10-K Highlights – the SEC Subpoena Is Not the Sole Cause for Concern,* PAA Research LLC, Feb. 25, 2013.  That overstatement does not account for the failure to reserve for the 2009 and 2010 RSAs, which the Company has admitted required additional reserves of at least $70 million.

126.   Moreover, according to analysts, the Sallie Mae settlement suggested that the cumulative loss rates on ITT's 2009 and 2010 RSAs could be as high as 80 percent.  In fact, PAA stated that it is highly likely that the loans issued pursuant to those RSAs would experience larger losses than the 2007 RSA.  Safalow, Feb. 25, 2013, *supra*.  Should these losses occur, analysts estimate that the Company could face up to an additional $190 million in repayment obligations over the next three years.

127.   Following the disclosure of the Sallie Mae settlement and the implications for the Company's liability under all the RSAs, the price of ITT stock dropped $3.72 per share, or $19.2 percent, to close at $15.57 per share on January 7, 2013.

128.   Finally, after the market closed on February 22, 2013, ITT filed an annual report on Form 10-K in which it disclosed that it had received a subpoena from the SEC on February 8, 2013 that requested the production of documents relating to ITT's accounting for the 2009 and 2010 RSAs.

129.   During the Relevant Period, ITT remained steadfast in its position that it was not required to include the liabilities from the RSAs on its balance sheet.  By refusing to include liabilities related to the RSAs on its balance sheet, the Company improperly understated its liabilities and overstated its financial strength.  PAA analyst Bradley Safalow was "stunned" to learn that the liabilities under the PEAKS Program had not already been consolidated onto ITT's balance sheet, and stated that the subpoena increases the risks that ITT may be required to restate earnings or be subject to significant civil penalties and fines.  Safalow, Feb 25, 2013, *supra*.

130.   Following the announcement of the SEC subpoena, ITT's stock price fell $3.10 per share, or 16.6 percent, to close at $15.53 per share on February 25, 2013.

131.   The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)   the Company had tremendous liability under the RSAs;

(b)   the Company continually downplayed its risks associated with the RSAs and assured investors that it had properly set aside reserves to meet its liabilities;

(c)   the Company was improperly accounting for the RSAs, and its accounting practices were repeatedly questioned by the SEC and are now the subject of a formal SEC investigation; and

(d)     by failing to book adequate reserves for its liabilities under the RSAs, the Company misrepresented its earnings throughout the Relevant Period.

132.   As a result of Defendants' false statements, ITT common stock traded at artificially inflated levels during the Relevant Period.  When Defendants revealed ITT's true financial condition and future business prospects, the price of ITT common stock fell more than 85 percent from its Relevant Period high.

133.   Thus, throughout the Relevant Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.

134.   Accordingly, the Company has been damaged.

## DERIVATIVE AND DEMAND ALLEGATIONS

135.   Plaintiff brings this action derivatively in the right and for the benefit of ITT to redress the breaches of fiduciary duty and other violations of law by Defendants.

136.   Plaintiff will adequately and fairly represent the interests of ITT and its shareholders in enforcing and prosecuting its rights.

137.   The Board currently consists of the following 9 directors: defendants Modany, Cozzi, Morgan, Dean, Fowler, Weber, Lau, Odle, and Yena.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

    a.   During the Relevant Period, the Audit Committee Defendants served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.  The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.  Therefore, the Audit Committee

Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

b.  The principal professional occupation of defendant Modany is his employment with ITT as its Chairman of the Board and CEO pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   Thus, defendant Modany lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action; and

c.  During the Relevant Period, and with the Company's securities trading at artificially inflated prices, defendants Modany, Cozzi, Dean, Fowler, Weber, Lau, and Odle, sold approximately 104,000 shares for proceeds of approximately $6,526,442.   Specifically, Modany sold 64,400 shares (more than 10% of his holdings) at $3,964,325; Cozzi sold 8,000 shares (more than 15% of his holdings) for proceeds of $495,520; Dean sold 12,942 shares (approximately 20% of his holdings) for proceeds of $852,028; Fowler sold 4,000 shares (more than 30% of his holdings) for proceeds of $265,267; Weber sold 8,000 shares (more than 20% of his holdings) for proceeds of $491,760; Lau sold 5,418 shares (approximately 15% of his holdings) for proceeds of $350,436; and Odle sold 1,462 shares (more than 18% of his holdings) for proceeds of $107,106.

## FIRST CAUSE OF ACTION

## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

138.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that ITT disseminated accurate, truthful and complete information to its shareholders.

140.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to ITT shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

141.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein, including the costs of defending federal securities fraud class actions recently filed against the Company in addition to costs associated with SEC investigations and likely enforcement actions to come.

## SECOND CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

142.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

143.   As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were reported accurately, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

144.   Defendants willfully ignored the obvious and pervasive problems with ITT's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

145.   As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## THIRD CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

146.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.   Defendants owed and owe ITT fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe ITT the highest obligation of good faith, fair dealing, loyalty and due care.

148.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

149.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, ITT has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

150.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

151.   Plaintiff, on behalf of ITT, has no adequate remedy at law.

FOURTH CAUSE OF ACTION

AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

152.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of ITT.

154.   Plaintiff, as a shareholder and representative of ITT, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**FIFTH CAUSE OF ACTION**

AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

155.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ITT, for which they are legally responsible.   In particular, Defendants abused their positions of authority by causing or allowing ITT to misrepresent material facts regarding its financial position and business prospects.

157.   As a direct and proximate result of Defendants' abuse of control, ITT has sustained significant damages.

158.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

159.   Plaintiff, on behalf of ITT, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

160.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.   Defendants had a duty to ITT and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of ITT.

162.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of ITT in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, Defendants breached their duties of due care,

diligence and candor in the management and administration of ITT's affairs and in the use and preservation of ITT's assets.

163.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused ITT to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to ITT, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged ITT.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.   Directing ITT to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.   Awarding to ITT restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May ___, 2013                    LIFSHITZ LAW FIRM


Joshua M. Lifshitz, Esq. (JL-9172)
18 East 41st Street
Suite 1105
New York, NY  10017
Telephone:  (212) 213-6222

Counsel for Plaintiff

## **VERIFICATION**

I, Sasha Wilfred, hereby declare as follows:

I am a shareholder of ITT Educational Services, Inc. and have continuously so owned ITT Educational Services, Inc. common stock during the relevant period. I have reviewed the foregoing Verified Shareholder Derivative Complaint ("Complaint"), and authorize its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information or belief.

I declare under penalty of perjury pursuant to the laws of this jurisdiction that the foregoing is true and correct and that this verification was executed at County of LOS ANGELES _____, in the State of California.

April 30, 2013

_____
Sasha Wilfred